**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00633 (RCL)** |
| **v.** | : | |
| | : | |
| **KELLY O'BRIEN,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kelly O'Brien to five months' incarceration, one year of supervised release, and $500 restitution.

**I.       Introduction**

The defendant, Kelly O'Brien, first anticipated, then urged others to join, then personally participated in the January 6, 2021 attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

O'Brien pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building, a Class A misdemeanor that is subject to the Sentencing Guidelines. As explained herein, a sentence of five months' incarceration is appropriate in this case because O'Brien: (1) posted videos to Facebook during the siege of the U.S. Capitol calling her fellow rioters as "brave patriots"; (2) was aware of the potential for violence, noting in one of

1

her Facebook videos that she was going to stay back, yet ultimately continued closer towards the Capitol building and entered the Capitol; (3) penetrated the U.S. Capitol all the way to the Speaker's office suite; (4) before entering the Speaker's office suite, and while pointing to an overhead sign identifying the Speaker's office suite, told other rioters "Look at that sign. We have to smash this place"; (5) made statements, including "no regrets…[,]" on Facebook in the days immediately following her breach of the Capitol that demonstrated a total lack of remorse; (6) destroyed evidence from her Facebook in an attempt to evade law enforcement detection; and (7) convicted of two prior misdemeanors.

Even if she didn't personally engage in violence or property destruction during the riot, before entering the Capitol on January 6, O'Brien encouraged and celebrated the violence of that day. She made a Facebook video post commending her other fellow rioters as "really brave patriots" who have been subject to tear gas and rubber bullets. Undeterred by the violence that was plainly in front of her, O'Brien breached the U.S. Capitol, entering through the Senate Wing Door approximately 10 minutes after the initial breach in that area. O'Brien then took an approximately twenty-one-minute parade through the U.S. Capitol, including Speaker Pelosi's office suite. Prior to entering this area, O'Brien pointed to the prominently displayed sign "Speaker of the House Nancy Pelosi" and told her fellow rioters that they needed to "smash" that area. After walking through Speaker Pelosi's office suite, O'Brien eventually left the U.S. Capitol via the Hall of Columns South doors.

The Court must consider that O'Brien's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, O'Brien's participation in a riot

that actually succeeded in halting the Congressional certification combined with O'Brien's preparation for violence, her celebration and endorsement of the violence on that day, her lack of remorse in the days immediately preceding the riot, her entry into the Speaker's suite, destruction of evidence, and the potential for future violence renders a jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 24 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to O'Brien's conduct and behavior on January 6.

### *Kelly O'Brien's Role in the January 6, 2021 Attack on the Capitol*

In the months leading up to the violent attack on the U.S. Capitol on January 6, 2021, O'Brien wrote numerous posts to her Facebook account regarding the 2020 Presidential Election and the planned January 6th rally in Washington, D.C.  Those statements became increasingly hostile, predicting violence and urging others to join violent attacks by self-styled "patriots" such as the Proud Boys against their perceived ideological opponents:

- On November 25, 2020, O'Brien commented to a November 24, 2020 post, "Don't worry, Howie.  The O'Brien armory is well stocked.  Just in case.  These idiot's [sic] don't even realize how hard it is to buy bullets.  They're gone.  We ain't worried. Lol."

- On November 26, 2020, O'Brien replied to a comment from a November 19, 2020 post and stated, "We do not riot.  We fight.  We are an Army of Patriots.  You will know us when you see us.  There will be no ambiguity.  Prepare yourself."

- On December 12, 2020, O'Brien posted about being in Washington, D.C. and being escorted back to her hotel by the Proud Boys.[1]

- On December 13, 2020, O'Brien posted on Facebook, "March for Trump.  We have the Spirit of 1776 in our hearts.  Rise up Patriots.  You are being Called."

- On December 19, 2020, O'Brien made the following status for her Facebook account, "WE ARE IN A BATTLE between GOOD and evil.  Make no mistake about that.  Elders are cheering us on and believe that WE ARE GOING TO BE THE GREATEST GENERATION in their lifetime.  And they lived through WWII. Are you going to fight or are you weak.  Let us know now.  WE NEED PATRIOTS! WE NEED FREEDOM FIGHTERS! NOW!"

- On December 19, 2020, O'Brien posted, "CALLING ALL PATRIOTS!  Be in Washington, D.C. January 6th.  This wasn't organized by any group.  DJT has invited us and its going to be 'wild.'"

- On December 19, 2020, O'Brien posted, "We are coming for you Antifa… If you plan on going to D.C. January 6th, which I highly recommend, it will be one of the greatest experiences of your life and I believe the duty of all able Patriots. However, it is not for the faint of heart at night.  Violence can and will break out. You won't expect it.  Antifa are cowards and they try to go after the vulnerable. When I was there last week there were tons of Proud Boys protecting Patriots. … And the scariest part is that d.c. police, for whatever reason, don't get involved. Even though they are nearby, do not expect protection from them."

- On December 26, 2021, O'Brien made the following Facebook status, "THE POWER IS WITH THE PEOPLE.  THE CONSTITUTION WAS CREATED FOR YOU.  NEVER, EVER GIVE UP YOUR POWER.  BE STRONG.  BELIEVE IN YOURSELF.  BELIEVE IN YOUR COUNTRY.  YOU HAVE ALL OF THE POWER.  YOU HAVE TO DEMAND IT.  FIGHT FOR IT. YOU. HAVE. THE. POWER. SHOW IT."

- On January 1, 2021, O'Brien made the following status, "On January 6th you will wonder?  How?  Thank the Patriots.  The 3 percent[2] fought for Freedom.  You did nothing."

---

[1] On December 12, 2020, a rally occurred in Washington, D.C. that led to violent clashes leaving at least four people stabbed and nine people transported to the hospital, two of whom were law enforcement officers.  Clashes also occurred between the Proud Boys and counter protestors.  *See.* https://www.npr.org/2020/12/12/945825924/trump-supporters-arrive-in-washington-once-again-for-a-million-maga-march.

[2] The reference to the "3 percent" commonly refers to the contention that only three percent of American colonists took up arms against the British during the American Revolution."

On the morning of January 6, 2021, O'Brien drove from Pennsylvania to Washington, D.C., where she checked into a hotel approximately four blocks from the Capitol. She then attended the rally at the Ellipse before proceeding to walk towards the Capitol while then-President Trump was speaking. While en route to the Capitol, O'Brien filmed the crowds of people walking east on Constitution Avenue, N.W. towards the Capitol, and stated on video, "The scope of this is unbelievable. Trump is still talking. I just started walking to the Capitol because I couldn't really hear him. We were so far back… There's got to literally be millions of people here… It is a beautiful thing patriots. Never stop fighting."

Once she arrived at the Capitol, she made a video of the area while stating, "just to give you some perspective, this was all barricaded and patriots have stormed the Capitol. Broke down the barriers. There's men with guns up there, and so, I'm thinking I might stay a little bit back… because once again, we own these buildings. We own this city. Our taxes bought and paid for this city." *See* Exhibit 1.

Thereafter, despite knowing that there was a breach of the grounds, O'Brien joined the mob of rioters inside the restricted area on the Capitol grounds. With the scaffolding visible in the distance and officers standing at the top of the stairwell, O'Brien again took videos of her surroundings. *See* Exhibit 2. She then continued to charge forward toward the West side of the Capitol, where she "live-streamed" on Facebook the events under the scaffolding as the rioters moved towards the northwest corner of the Capitol. While recording that video, O'Brien stated, "So we are getting gassed and [hit with] rubber bullets. We are underneath Joe fake Biden's Inaugural steps… we are probably about twenty feet to forty feet from the Capitol doors. Some really brave patriots here. So, I am right in the thick of it… the gas is bad… Please pray for us."

*See* Exhibit 3.  Notably, the audio in the video captured the chaos around her, including bang

sounds, and the caption O'Brien chose for this Facebook live video was "Be not afraid."



(*screenshot of Exhibit 3*)


After climbing the northwest staircase, O'Brien posted an update to her Facebook account,

alerting her followers that she had reached the "front door" (actually the Senate Wing Door) of the

Capitol.



*(Senate Wing doors circled in red)*

The U.S. Capitol was first breached in this location by a rioter who climbed through a broken window adjacent to the Senate Wing Door at approximately 2:13 P.M., which is depicted below.



*(initial breach of Senate Wing door area)*

At approximately 2:23 P.M., O'Brien entered the U.S. Capitol via the Senate Wing doors, which are the doors in the center of the above photograph.



(O' Brien *circled in red)*

After entering the U.S. Capitol, she proceeded towards the Crypt along with other rioters and from there, to the second floor of the Capitol towards the Speaker's office suite, which she entered at approximately 2:33 P.M.  Notably, O'Brien appeared to be cheering as she entered the Crypt, with both arms raised.



*(O'Brien circled in red entering the Crypt)*



*(O'Brien circled in red inside of Speaker Pelosi's office suite)*

During her post-plea interview, O'Brien stated that she did not intend to go to the Speaker's office suite.  Rather she followed the crowd, which led her there.  While outside that suite, O'Brien can be seen pointing in the direction of the sign identifying the office space and can be heard saying "Look at that sign.  We have to smash this place."  She then briefly entered Speaker Pelosi's office suite, walking through one office and down the hallway.  *See* Exhibit 4 (depicting O'Brien outside of the Speaker's office suite and later inside of the office suite).



*(sign for Speaker's suite)*



*(O'Brien pointed towards Speaker Pelosi's Office Suite Sign)*



*(O'Brien in Speaker Pelosi's Office Suite)*

O'Brien walked through the Speaker's office suite and did not remain there for very long, approximately less than 2 minutes. However, while she was leaving the Speaker's office suite, another rioter broke the above depicted sign identifying the Speaker's office suite. O'Brien cheered and rubbed the head of the rioter who was breaking the sign. *See* Exhibit 5 (timestamp 1 minute 10 seconds). After this incident, she proceeded towards Statutory Hall and eventually exited the U.S. Capitol at approximately 2:44 P.M. via the Hall of Columns South doors.



*(O'Brien circled in red in Statutory Hall)*



(*O'Brien circled in red*)

After exiting the Capitol building, O'Brien returned to her hotel and departed

Washington, D.C. the following day, January 7, 2021.  She also alerted her Facebook followers

that she left.



Sometime after leaving the U.S. Capitol, O'Brien deleted several posts from her

Facebook account, including posts referencing her entrance into the Capitol on January 6, 2021

in an attempt to evade law enforcement detention.[3]

---

[3] During her post-plea interview, O'Brien said that she also deleted the posts to avoid repercussions from former high school associates.  She also commented that she did not believe something could really be deleted from the internet.

On January 7, 2021, O'Brien made the following post to her Facebook account:



At some point, she also instructed others to delete a video she shared of the Capitol:



In a private message on January 7, 2021, to another Facebook user, O'Brien stated that "I scrubbed the video.  Thank you!!!! Do you think i will get arrested?"

O'Brien both attempted to conceal the extent of her unlawful conduct on January 6 and expressed no remorse for it. On January 7, 2021, she posted "No regrets…"; on January 8, 2021, she posted "There is no grey area anymore.  It's time to pick a lane.  Are you on the side of

freedom? … Patriot or coward? Who are you?"; and on January 10, 2021, she posted, "GOD BLESS THE PATRIOTS… You have earned upmost respect and loyalty.  Thank you Patriots."

*The Charges and Plea Agreement*

On August 18, 2021, O'Brien was arrested in Pennsylvania via a complaint with arrest warrant.  On October 19, 2021, O'Brien was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On January 5, 2022, she pleaded guilty to Count One of the Information, charging her with a violation of 18 U.S.C. §1752(a)(1), Entering and Remaining in a Restricted Building. By plea agreement, O'Brien agreed to pay $500 in restitution to the Department of the Treasury.

*Kelly O'Brien's Post-plea FBI Interview*

On February 4, 2022, O'Brien, along with her attorney, participated in a post-plea interview with FBI agents pursuant to the plea agreement.  During the interview, O'Brien stated that she initially heard about the January 6, 2021 rally on social media approximately two to three before it occurred.  She searched for hotels within walking distance to the rally and then drove to Washington, D.C. the morning of January 6, 2021.  She left her bags at the hotel and then walked to the rally.  O'Brien explained that she was too late to enter the outer gates of the events and had to watch the rally via a video screen.  She then decided to walk back to her hotel to get food and warm up.  O'Brien started to walk towards the Capitol because she knew she had to make a left at the Capitol to get back to her hotel.  While walking with other people, O'Brien stated that no one was talking about going to the Capitol specifically.

O'Brien stated that once she arrived at the Capitol, she noticed the fences around the grounds and someone had mentioned that they had stormed the Capitol.  O'Brien then decided to get closer to the Capitol and while at the base of the stairs near the Presidential Inauguration

14

scaffolding, she live-streamed a video on Facebook.  O'Brien explained that she began to move forward with the crowd because she felt it was an opportunity to stand up and be heard regarding the recent election.  During the interview, O'Brien stated it was a bad decision to move forward with the crowd and ultimately enter the U.S. Capitol.

O'Brien stated that when she entered the Capitol she did not see any violence taking place with the protestors.  O'Brien followed the crowd through the hallways to a set of spiral stairs.  She then walked up the steps to the second floor.  Once there, the crowd mentioned they were in front of Speaker Pelosi's office, which also had a sign over the doorway.  O'Brien stated that she did not plan to seek out Speaker Pelosi's office but just ended up there by chance.

O'Brien admitted to entering Speaker Pelosi's office suite and walked through it for approximately one minute before leaving the area.  When asked about her Facebook post regarding someone trashing Speaker Pelosi's office, O'Brien commented that the office was neat when she went in there and the comment may have possibly referred to someone breaking a plaque.  She stated that the crowd mentioned someone had been shot, and so, O'Brien decided it was time to leave the Capitol.  She encountered law enforcement officers who escorted her to a side exit door. Once outside, she returned to her hotel and left Washington, D.C. the following day.  O'Brien also admitted to deleting items from her Facebook account. She said she did not believe one could truly delete things from the internet nor did she think of it as hiding evidence.  She added that she also deleted the Facebook posts because she did not want to deal with the outlash of her former high school friends.

### III.    Statutory Penalties

O'Brien now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1).  She faces up to one year of imprisonment and a fine of up to $100,000.  She must also pay restitution

under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated O'Brien's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | 2 |
| Adjustment for Obstruction of Justice (U.S.S.G. §3C1.1) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 6 |

*See* PSR at ¶¶ 30-39.

The U.S. Probation Office calculated O'Brien's criminal history as a category III.[4]  PSR at ¶ 43. Accordingly, the U.S. Probation Office calculated O'Brien's total adjusted offense level, after acceptance, at 6, and her corresponding Guidelines imprisonment range at 2-8 months. PSR

---

[4] As the PSR correctly notes, the Government's estimated criminal history calculation differs from Probation's criminal history calculations and it appears that Probation's calculations are correct.

at ¶¶ 82. O'Brien's plea agreement contains an agreed-upon Guidelines calculation of 1-7 months.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. See 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged many persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while assessing O'Brien's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had O'Brien personally engaged in violence or destruction, as opposed to egging others on to do so, she would be facing additional charges and/or penalties associated with that conduct. The absence of evidence that O'Brien herself engaged in violent or destructive acts

is therefore not a mitigating factor in this case, nor does it meaningfully distinguish O'Brien from most other misdemeanor defendants.

Based on her own Facebook posts, described above, O'Brien traveled to Washington, D.C. on January 6, 2021 knowing that violence could break out. Even had she not known about the potential of violence prior to departing Pennsylvania on the morning of January 6, 2021, she certainly knew the potential for violence given her own statements and videos from the grounds of the Capitol. As depicted in Exhibit 1, she was not yet swallowed up in the riotous mob occupying the grounds of the Capitol when she reported to her Facebook followers that the barriers were broken down by so called patriots. She could have left the grounds then, especially when she commented on men with guns being in the front. Instead, she forged forward. During another Facebook post, she was wholly consumed by her fellow rioters. In Exhibit 2 and 3, she captured the chaos in her videos. She even reported that police had to deploy tear gas and rubber bullets against the rioters. O'Brien mischaracterized her fellow rioters as "brave patriots" while recording their criminal conduct.

O'Brien then entered the Capitol via the Senate Wing doors approximately ten minutes after the initial breach in the same area and proceeded to the Crypt. She ultimately ventured to Speaker Pelosi's office suite. While she may not have known that the trajectory of her route would take her to Speaker Pelosi's office suite, she was surely aware of whose office suite she entered at 2:44 p.m. Right before her entry into this sensitive space, she saw the conspicuously displayed sign identifying whose office it was and had the audacity to encourage other rioters "to smash this place." While leaving the Speaker's office suite, a fellow rioter did in fact "smash" the area, specifically he destroyed the sign identifying the area as the Speaker's office suite. O'Brien cheered on this destruction and further rubbed the rioter's head in an expression of support and

congratulations.   Accordingly, while she did not commit the destruction herself, she enthusiastically witnessed property destruction.  O'Brien eventually left the Capitol after hearing that someone had been shot.  She traveled back home the following day.

While she expressed remorse in her actions during her post-plea interview, her activity immediately following January 6, 2021 shows an utter lack of remorse.  If there is any doubt as to her mindset the days after she invaded the U.S. Capitol, O'Brien's own words have provided full clarity: "No regrets…"  That is what she felt the day after January 6, 2021.  She, however, made additional posts to solidify her views on what happened on that tragic day: on January 6, 2021, she posted "someone may have trashed a certain speaker of the houses office. But I will never tell who"; on January 8, 2021, she posted "There is no grey area anymore.  It's time to pick a lane. Are you on the side of freedom? … Patriot or coward? Who are you?"; and on January 10, 2021, she posted, "GOD BLESS THE PATRIOTS… You have earned upmost respect and loyalty. Thank you Patriots."  The remorse she now feels and shared during her post-plea interview may have been prompted by the heavy weight of being arrested and charged for her part in the riot of January 6, 2021.

During her post-plea interview, O'Brien minimized her efforts to destroy evidence, specifically her Facebook posts.  While made claims that she deleted her Facebook posts in part because she did not want to deal with the outlash of her former high school friends, her posts indicate otherwise.  She made a public post on January 7, 2021 about "scrub" her page "for obvious reasons," and messaged another person, "also I scrubbed the video.  Thank you!!!! Do you think i will get arrested?"  However, this minimization counters the comments she made on Facebook shortly after January 6, 2021, which are described above, and her signed Statement of Offense.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  O'Brien's History and Characteristics

As set forth in the PSR, O'Brien's criminal history consists of two convictions for Driving Under the Influence of Alcohol or Controlled Substances. PSR ¶¶ 41-42.  O'Brien reported to the Probation Office that she did not have to participate in substance abuse treatment as a result of her DUI convictions in 2011.  However, the PSR noted that outpatient treatment was a condition imposed by the Court.  PSR ¶61.

O'Brien has a consistent employment history, and has held her current position of office manager since February 2020.  O'Brien has been compliant with her conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [STET] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be

deterred.") (statement of Judge Nichols at sentencing); *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

O'Brien's actions and statements on social media clearly demonstrate the need for specific deterrence for this defendant. Her posts leading up to the January 6, 2021 riot were increasingly concerning and calling for violence. For example, on November 25, 2020, O'Brien commented to a November 24, 2020 post, "The O'Brien armory is well stocked. Just in case. These idiot's [sic] don't even realize how hard it is to buy bullets. They're gone. We ain't worried. Lol." On December 19, 2020, she posted "If you plan on going to D.C. January 6th, which I highly recommend, it will be one of the greatest experiences of your life and I believe the duty of all able Patriots. However, it is not for the faint of heart at night. Violence can and will break out." While in the midst of her procession into the Capitol, O'Brien lauded her fellow rioters as "brave patriots," and several days following that tragic day, she posted to Facebook "GOD BLESS THE

PATRIOTS… You have earned upmost respect and loyalty.  Thank you Patriots."  Then, before even entering the Capitol she witnessed the violence she predicted and while inside of the Capitol, she felt brazen enough to encourage other rioters to "smash" Speaker Pelosi's office suite.  She then paraded through the office suite and cheered on a fellow rioter who broke Speaker Pelosi's office suite sign.  Without a doubt, O'Brien had no regrets of her actions on that day or even in the days following.  She gloated the destruction of Speaker Pelosi's office suite after leaving the Capitol and later confirmed online that she harbored "no regrets."  Possibly, her only remorse in the days after the fatal riot was her documentation and announcement of her participation in the riot via Facebook, which she promptly attempted to destroy in order to avoid law enforcement detection.

The government acknowledges that O'Brien accepted responsibility by entering into a plea agreement shortly after being arraigned on the Information.  Additionally, the government acknowledges that O'Brien expressed remorse during her post-plea interview when she noted that it was a bad decision to go into the Capitol.  However, the timing of this contrition juxtaposed with her statements and activity during and the days following January 6, 2021, begs to question how much of this remorse is driven by her arrest.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). The government is seeking a sentence within the applicable Guidelines range which, if imposed, will not result in an unwarranted disparity.

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[6] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[7] Indeed, this Court has warned that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

---

[6] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.  O'Brien has pleaded guilty to Count One of the Information, charging her with entering and remaining in a restricted building, a violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch

27

of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

Judges of this court have sentenced Capitol breach defendants who, similar to O'Brien, spent time in sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or Speaker Pelosi's office suite, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's mere presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in *United States v. Andrew C. Ericso*n, 21-cr-506 (TNM); *United States v. James Bonet,* 21-cr-121 (EGS);*United States v. Derek Jancart,* 21-cr-148 (JEB); *United States v. Leonard Pearson Ridge IV,* 21-cr-406 (JEB); and *United States v. Erik Rau,* 21-cr-467 (JEB).. In *Ericson,* similar to O'Brien, the defendant entered the United States Capitol at approximately 2:24 p.m. and ultimately ended up in Speaker Pelosi's conference room, where he sat at a chair with his feet on the table and removed a beer from a mini fridge. The defendant made several posts to social media documenting his presence at the Capitol. However, the defendant removed the content from his social media

accounts after January 6, 2021, although it is not clear that was done for the purpose of destroying incriminating evidence.  The defendant plead guilty to 40 U.S.C. §5104(e)(2)(g).  The government recommended 2 months' incarceration and the Court imposed a sentence of 20 days' incarceration, over consecutive weekends, and 36 months probation.

In *Bonet,* the defendant filmed various moments of his approach to the Capitol building and how they were taking back the building.  The Defendant then entered Senator Merkley's office for approximately four minutes and smoked marijuana. The defendant then left the office, went to the Crypt before eventually leaving the Capitol building at approximately 3:26 p.m.  The defendant pled guilty to 18 U.S.C. § 1752(A)(1).  The government recommended 45 days' incarceration and one year of probation.  The Court sentenced the defendant to 90 days' incarceration and one year of probation.

In *Jancart,* the defendant, an Air Force veteran, responded to the Capitol with defendant Rau (discussed below) on January 6, 2021 only after learning it had been breached.  He laughed and cheered while the forward line of rioters broke through the police line and posted a video of defendant Rau screaming "we have you surrounded."  He, along with defendant Rau, used a bike rack to scale a wall and ultimately enter the Capitol through the Senate Wing door.  Jancart walked towards the Speaker's conference room and stood outside to take a photograph while defendant Rau entered the conference room.  The Defendant then spread false propaganda on Facebook regarding the attack on the Capitol.  The defendant pled guilty to 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building).  The government recommended four months' incarceration and the Court sentenced the defendant to forty-five days' incarceration.

In *Rau,* the defendant responded to the Capitol on January 6, 2021 only after learning it had been breached.  He encouraged and incited violence by screaming "we have you surrounded"

29

to the police while the forward line of the rioters broke through the police line.  The defendant used a bike rack to scale a wall and ultimately entered the Senate Wing door.  The defendant also entered the Speaker's conference room for approximately 15 seconds and deleted evidence, specifically text messages and photographs in the text message exchange, from his cellphone after leaving the Capitol.  The defendant pled guilty to 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building).  The government recommended four months' incarceration, and the Court imposed a sentence of forty-five days' incarceration.

In *Ridge,* the defendant made multiple posts prior to January 6, 2021 and expressed an anticipation that he and others would "try to block the session of [C]ongress."  The defendant recorded further unlawful activities in the Capitol, including an individual attempting to break open a closed door with an object.  The defendant spent approximately thirty-five minutes in the Capitol, and after leaving the Capitol, he boasted online about the riot, including that he stormed the Capitol.  The defendant plead guilty to 18 U.S.C. §1752(a)(1).  The government recommended 45 days' incarceration and one year of probation.  The Court sentenced him to 14 days' incarceration and one year probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Kelly O'Brien to five months' incarceration, and $500 in restitution.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:  _____*/s/ Maria Fedor*_____
MARIA Y. FEDOR
Attorney, detailed to the
United States Attorney's Office for the
District of Columbia
D.C. Bar No. 985823
555 Fourth Street, N.W.
Washington, DC 20530
Maria.Fedor@usdoj.gov

31

## CERTIFICATE OF SERVICE

On this 29th day of March 2022, a copy of the foregoing was served upon all parties listed

on the Electronic Case Filing (ECF) System.


By:     /s/ *Maria Y. Fedor*
MARIA Y. FEDOR
D.C. Bar No. 985823
Attorney, detailed to
United States Attorney's Office
for the District of Columbia
Maria.Fedor@usdoj.gov